First case of the afternoon, Archer Daniels Midland v. Sinele. How do you pronounce that? Sinele, Your Honor. Sinele. Very good. For the appellant, Mr. Callaway, for the appellee, Mr. Stocks, you may proceed. Good afternoon, Your Honors. May it please the Court, as Courts where I am here on behalf of Mr. Sinele and his solely owned consulting business, which is the other defendant by the name of LSA, Link LLC, which I'll refer to as Sinele, essentially. And this is an interlocutory appeal of a preliminary injunction order that was entered through oral findings on September 27, 2018, after essentially a full day of evidence. And that hearing followed a TRO, Temporary Restraining Order, that had been entered two weeks earlier without notice to Mr. Sinele. And then there was the subsequent order, October 1, 2018, in writing, which prohibits the defendants preliminarily from transacting any business activity involving sales-slash-purchase in the sweeteners market involving any ADM, buyer-customer service by Sinele, any time during the last two years of his employment. The facts show, I'm not going to recite all the facts, that Mr. Sinele resigned as a sales representative from ADM on August, effective August 3, 2018, then started a consulting business after that. Prior to that point, he had been a part-time farmer, has a farm, has been in his family for generations, and a full-time sales rep, employee of ADM. Then he went to a part-time consultant, or attempted to, and a full-time farmer. So that was his plan. So he used to sell it, now he wants to help people buy it. His position was, on behalf of ADM, to sell the sweetener products, and there are five companies that do that, manufacture and sell sweetener products, then in his consulting business to serve as a consultant for the buyers. So, and very germane to that question, which I'll get to the standard here in a bit, is that he's not working for one of the five competitors. This is not a case where someone left Tate & Lyle to go to ADM, or ADM to go to Tate & Lyle. Did these buyers have consultants working for them before, or is this a new concept that your client developed after he left ADM? Well, I don't know if buyers use any particular consultants. To me, it is a new concept that Mr. Sinley intended to do as a part-time consultant. So you don't know if the buyers had consultants that had used them in the past, or whether he has competition of his own, meaning there were other consultants who represent different buyers. No, there's no evidence on that point, Your Honor.  I don't think so. Yeah, I mean, I think any buyer – I can use a consultant to serve for me, which I do, to buy insurance, to buy homeowners, to buy whatever, and I use them. People use agents, buy houses and so forth, but to be responsive to your question, there wasn't evidence about others serving as a consulting business. It was something that Mr. Sinley decided to do based on any evidences in that. His degree in agriculture and his MBA and that he's been in agriculture – Well, it would be fair to say, in his position at ADM, if there were consultants, he would probably have known about them because he probably would have had dealings with them. That may be true. And I do understand there was some evidence that ADM would use consultants or brokers for its business in some capacity. And that there was evidence of a discussion between Mr. Sinley and Mr. Lott to possibly do that. So he would be working part-time, but ADM was not interested in retaining him as a consultant to be a broker for ADM after he resigned. And then he came up, he decided to pursue his consulting business afterwards to represent buyers. Now, I think it's significant that the trial court, at the end of the hearing on September 27, 2018, when addressing entering the extent of the order orally from the trial court, is that the court finds the people, excuse me, not the people, but the petitioner has proven by a preponderance of the evidence the necessary elements for the issuance of a preliminary injunction. And when the court got to then setting a bond, the court stated, and I'm quoting this, Well, with all due respect to counsel, I think the bond should be higher than what he's recommended. I don't know that I'm right today. I don't know that I'm wrong. I would hope that I'm right. But if I'm not, the appellate court sees it differently. I don't want him to lose any funds. The bond will be set at $250,000. I'm here today to respectfully submit the trial court got it wrong and implored this appellate court to see it differently based upon the standards that have been enunciated as to when a former employer can obtain a court-created non-competition restriction when there is no restrictive covenant in any agreement that the former employee had with the former employer, which the facts are undisputed. Mr. Sinley had no restrictive covenant agreement with ADM. The only thing he had was about a two-page nondisclosure agreement back around 1990 and when he started with ADM after he finished all his education, which describes inventions protection and has a couple of sentences that he will not disclose confidential information. And significantly, there was no evidence of any violation of that agreement. Mr. Lutt, the president of the Sweetener's Division for ADM, acknowledged that there was no evidence, no facts, no information known that Mr. Sinley had violated that confidentiality obligation. And very importantly, given the standards involved that govern under Illinois law, entry by a judge of a restrictive covenant under the inevitable disclosure of trade secrets doctrine, that those standards were not met. And I believe the former employer of the court, to reach that conclusion, now the key case that I've cited in the opening reply brief is the Triumph packaging case. Now that is a case where the court discussed what the standards are to have a court create a non-compete agreement where the employee never signed one. And the court stated, in Triumph Packaging Group v. Ward, courts consider the following factors in determining whether disclosure of trade secrets is inevitable. One, the level of competition between the former employer and the new employer. Two, whether the employee's position with the new employer is comparable to the position he held with the former employer. And three, the actions that the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. And the court goes on to say the mere fact that someone assumes a position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information. And that the fear that its former employee, fear of the employer, will use trade secrets in the new position is insufficient to justify application of the inevitable disclosure of trade secrets doctrine. The employer must demonstrate a, quote, high probability that the employee, former employee, will use them. And went on to indicate it's a sparingly used doctrine for good reason because it results in a court creating a non-compete restrictive covenant that the employee never agreed to. So when we apply those tasks that were not articulated in any findings of the trial court, there was, first off, Mr. Sinley's not working for a competitor. Both sides acknowledge there are five companies involved in the manufacturing and selling of the sweetener's products. One of which is ADM. His consulting business on behalf of buyers or customers is not one of those competitive companies. The others are Tate and Lyle, Cargill, Ingredient, and Roquet. Mr. Sinley's not working for a competitor. So that is the first basis that we respectfully submit there should be no judicially graded non-compete obligation or restriction on running a consulting business. Then secondly, and I submit that that should resolve the case, but I respect we need to address other issues. But the second point here is when you look at the case where the sparingly used doctrine allows a court to create a non-compete restrictive covenant the former employee never agreed to. I submit you will see that there has always been something on which there could be a conclusion to support an inevitable disclosure of a trade secret. That the former employee downloaded all types of confidential information, put them on a thumb drive, printed and took proprietary documents and information. I believe the court, your honors, would say that's when that doctrine has been used. Not here. When the only evidence that was presented was that Mr. Sinley had access to confidential information as a result of his employment with ADM. So the question is what is a trade secret? How could it be utilized? Yeah, that's really two questions, your honor. One, has a trade secret been clearly identified? Then two, what is the evidence which is needed to show there's a high probability that an identifiable trade secret will be disclosed? And not that, well, maybe something maybe or, you know, fear or belief. So what is the evidence, one, of a particularized trade secret? In the oral findings, the court identified that there was evidence of four or five items of confidential information, which Mr. Lott, the president of the Sweeteners Division, testified about. We're not disputing that Mr. Sinley, like most employees of a company or a sales rep, wouldn't have access to some kind of confidential information along the way. But there was no evidence whatsoever of any use of confidential information of ADM. No evidence whatsoever of any disclosure of confidential information of ADM. No evidence, as in other cases, of some nefarious conduct where a former employee downloads and takes valuable proprietary information or has used it. So those are the two keys. There's not a competitor, and there really was no evidence of any nefarious conduct, taking anything. There was a lot of evidence about this system, data system called Tableau, upon which confidential information is stored. But there was no evidence, and Mr. Sinley would access that in his job, that he took anything from this Tableau system, and in fact the evidence is clear, he couldn't even access that when he had left, and that there wasn't any evidence of trying to download or take any information. And the other witness of ADM, Scott Moss, testified specifically that it would be an impossible task to even do so. That's information you look at a screen, it changes daily, but you can't print it all out, you couldn't take it with them. No evidence he would even do so or try to do so, but it was an impossible task. So there has to be something to create a restrictive covenant under this inevitable disclosure of trade secrets, and there was nothing to support that, Your Honors. That decision, and I would respectfully ask the Court to consider that, upholding a court-ordered restriction on being able to run a consulting business as one person, as Mr. Sinley is doing, to represent buyers, based solely on evidence that ADM has confidential information, none of which was ever used, none of which there's any evidence that Mr. Sinley has taken, used, that would turn the inevitable disclosure of trade secrets doctrine, which is a sparingly used doctrine, on its head. It simply should not have ever been applied here. Now, granted, as I mentioned, the trial court realized he doesn't know if he was right or wrong. We are here today to suggest and convince this Court he was wrong. Because otherwise, was every employer going to be able to march into court where it doesn't have a restrictive covenant with a former employee and just say they had confidential information, I think maybe he'll use it or I think he could use it? That's contrary to the standards, which I detailed much more in the brief. If I understand your argument, you're saying in order for ADM to invoke inevitable disclosure, it requires some kind of nefarious conduct on the part of your client? Because that doesn't seem to me to be consistent. I'm sorry? They seem to be inconsistent. Inevitable disclosure versus nefarious conduct. Well, I use the nefarious conduct must be present before there can be an inevitable disclosure. It doesn't seem logical to me is what I'm trying to ask. I would like to, Your Honor. I use the nefarious conduct because there has to be something for a court to conclude a trade secret would inevitably be disclosed. When you look at the cases where the doctrine's been applied for a court to create a restrictive covenant, you look at the facts and they typically involve what I call nefarious conduct, which could lead a trial court to reasonably conclude that someone would inevitably use a trade secret. They took them. They have the documents. They downloaded it, which supports a conclusion that a trade secret will inevitably be used. So that's what's missing here. And whether you use the words nefarious conduct or some wrongdoing or something that the former employee did or is using, that's what supports the sparing case is that an injunction is based upon a conclusion of inevitable disclosure of trade secrets. Well, in the nondisclosure agreements, there is specific reference to the prices at which it sells or has sold its product. So regardless of the potential for the materials on that system or the operating system that's used, regardless of that changing from day to day, wouldn't there still be a range within which the company was willing to sell or has sold its products in the past? And if that is viewed as something that shouldn't be disclosed, then even in the absence of a restrictive covenant, that's something that ADM cares about. I agree with you. So what should they have done? They should not have sued him. No, no. I mean, what should they have done ahead of time to prevent that information from being used? I thought you would say they should have tried to get him to sign a restrictive covenant. I've got two things, and you're right. That was the second thing I was going to say. And that's what the courts say in Illinois. But I wanted to point out, which is why I said that there was no evidence or any information that Mr. Sinley had breached that nondisclosure provision. Well, yeah, because the nondisclosure only applies to when he's working there. No, it applies whenever you leave. You still, as an employee, you cannot take confidential information and use it later, and you're expected to protect that. But it's said that the agreement is only in effect until you're employed by the company, as long as you're employed by the company. But that doesn't matter. Your time has expired. We'll hear from you on revoking. All right, very good. Thank you. Please, the Court. Mr. Callaway. First, our remedy that we seek is the protection of our secrets. It's not a restrictive covenant. But how do you protect your secrets, and how do we fashion a remedy that protects our secrets? Our secrets find two avenues, two pathways where we can protect these. Under the Trade Secrets Act, where it doesn't have to be actual. You know, this nefarious conduct seems to say there's no such thing as an inevitable doctrine. There must be only an inevitable doctrine. So ADM, when confronted with this situation, wants to stop the use of their secrets. They have an NDA that does apply. Certainly, it has no geographic or durational limitation within it following the employment. But it also has the Illinois Trade Secrets Act. So we're going down each of those pathways together or in the alternative. We'd only note that Section 8 of the Trade Secrets Act seems to suggest that the policy in Illinois, that an NDA would not be unenforceable merely because of no limitation in geography or duration. Practically, an NDA is limited because that secret becomes stale at some point in time. And staleness is not an issue we're dealing with in this case. We have Mr. Sidley upon the precipice of the annual contracting season. Two types of customers. The annual contracting, they are the high margin, relatively high margin customers. That is a fact that would only be known internally to ADM. Because the five types of proprietary data that the court recognized is how ADM, through plant efficiencies, through transportation costs, a massive investment by ADM in being an industry leader in terms of being able to deliver its commodity, its product to customer. The raw material acquisition costs, the efficiencies of the plant to know what our margins are and what byproducts we spin off and would then be available for sale. All the internal ideas as to how ADM operates and how that performance is impacted in any particular contract with a customer. But now you're talking about ideas. Ideas would change from season to season? No, it's much more than ideas. It's the actual economic performance of ADM. It's importance in the situation we have here, which I would say is a half step from Mr. Sinley going to another manufacturer when he's flipping from today I'm your seller, the next day I'm your buyer, is that the most competitive, what I would submit is the most acutely competitive process is between seller and buyer negotiating a price, delivery dates. Because we're dealing with delivered pricing, which may be a point that could be missed if I don't point it out, is that that brings into the process all of the variables taking product from farmer's field to getting it to that ultimate buyer. We're just not like at the retail market selling it for a fixed price. That could change day by day. And this would be known by going into the Tableau system. It's all of those internal components that define ADM's margin. And why this is so potentially injurious to ADM is that today or yesterday, Mr. Sinley knew all of those internal factors relative to ADM's position, relative to PMP or sensory effects, the two that he did go to, and he would know what ADM's margin is. And effectively, he's put himself in an exclusive arrangement to negotiate on behalf of these former or still current ADM customers with the entire marketplace armed with ADM secrets and has said in his testimony, Mr. Sinley's testimony, I wanted to create a niche in the market to assist those high margin customers that don't know how it operates so that I can bring to create my niche and have this bird's eye view and tell them whether they're getting a good deal or not a good deal. Now, he may not actually disclose right down and send a spreadsheet to the customer. These are ADM's margins. What he testified he would do is say, I think you can do better. There are better options in the market. But for ADM, he specifically knows that margin tolerance. But isn't the margin tolerance that would be disclosed by the database or your knowledge of the internal workings of the company, isn't it fluid? Variables are fluid, but relationship is not. In other words, where certain variable, the price of corn coming in, can fluctuate from day to day, because of what it is measuring is if ADM is paying X for corn here, their efficiencies, their transportation costs still, as Mr. Lutz specifically testified, the margins remain constant over time, even though you may have subcomponent variables that would shift up or down because their pricing will take that into effect to try to protect that margin. So it is not, the idea that the information becomes stale very quickly, which is I think the point to saying that a variable can fluctuate, is that it does not become stale in terms of the high margin, mid margin, or for that matter even what they call the rolling customers, because those margin relationships, even though certain variables may change, the margin relationship remains constant. And Mr. Lutz testified and explained that very fact in his testimony before the trial court. For somebody like me then, I think you're saying that the margin, whatever the margin is, the margin that you will tolerate to make a profit or to go in the hole. Or the size of profit. ADM probably, with many of these higher volume customers, probably sits in a position of both absolute and comparative advantage. And this is why you're, in terms of getting their business, but why this is different and distinguishable, and why the injury is more acute here than what it is had Mr. Sindley gone to Cargill. Cargill, because of the location of its facility, because of its transportation basis, or other economic factors, may never be able to actually sell to a particular high margin customer. But Mr. Sindley, because their fixed and variable cost per unit of product is simply going to be high because the plant is in Nebraska as opposed to Illinois. Big factor. And the one thing that I mentioned earlier is ADM's really strong advantage in the transportation sector. In moving its product. And just the huge investment that ADM enjoys. But Mr. Sindley, where he hurts us is that he knows ADM's tolerance. And he can go in his consulting business and say, say we have four cents per CWT on a particular sweetener product. And he knows Cargill can only come in at one and a half. But he can sit there and say, what ADM's margin being four, he goes, you can do better. You can do better. So if he was consulting for Cargill, this would be a different case? I think that the immediacy of the harm to ADM is manifest in our case compared to how it worked for Cargill. Because Cargill still would have to, unless they were due predatory pricing, they were still going, they could only price, you would assume, to a level that they were making money. With ADM and the knowledge that he can take to that buyer, he can play the entire game in ADM's margin. Because when ADM is at 4x margin, there's nobody else in the game. But he can sit there and say, you can do better than that. Because he knows ADM has that tolerance. He can do better by negotiating further with ADM or by looking elsewhere. Exactly. Which? Which is, both could work, but probably he would, in certain customers, it would be more effective for him just to negotiate against ADM. Consider the situation ADM found itself. August 3 is his last day, August 1 or August 3, is his last day at ADM. Within 10 days, he's already under a contract with two of our higher margin customers to act as their exclusive representative in buying sweeteners in the industry. Within two weeks after that, three weeks, we're getting contacted and told, we've got bids from everybody else, buy Mr. Sinley, we need your bid. That is our first discovery that Mr. Sinley has gone out, has yesterday been the guy actually going out procuring the buys, is now out negotiating on behalf of that buyer. We are then facing, do we acquiesce in him standing in that position, or do we do as we did, seek the injunctive relief to protect our trade secrets and that commercial data that enables him to negotiate against us? What prevents you from saying no? Well, we could say no, but are we not still harmed? We have volume we have to move. Volume of sweetener. You're telling me that you're successful. I mean, no, I'm implying that you're successful enough and have such a competitive advantage over many of these other individuals that you're either going to sell it or those buyers are going to buckle and pay the price that you require. But we are in a competitive negotiation where they are going to know and he's going to rely upon, inevitably, which the test is could he not help but rely upon what he knows about ADM when negotiating with ADM when yesterday he was the guy in ADM's role. And he's able to lever down by offering that information. Now, there may be, I've given you an example, and there will be some customers that they will be able to negotiate to a better position to a competitor. But he is going to be in the position to lever us down in that negotiation. We're having our own secrets used against us in a competitive process. What's the secret? Our margins. It's a matrix of moving parts. It is. I believe in one of the cases they've cited, it wasn't the ILG, but where a pricing and raw materials matrix is a trade secret, has been recognized as such. And I even believe under the plain terms of the Trade Secrets Act is a trade secret. So that information is being exploited in a competitive negotiation. And we have no choice but as to that customer, because of the contracts he's entered, to deal with him. And so we're facing a scenario where we negotiate with someone who holds all our secrets, which doesn't seem to be a fair negotiation, which kind of invokes the triumph case he cites, is that the whole purpose of the Trade Secret Act is to inject some commercial morality. And we're now in a situation where we're negotiating with a guy who knows all our secrets. And how do we actually achieve that when saying, no, we can't do that? Oh, yeah, I know you can do that. I know you've got this tolerance on that delivery date, these terms that you've offered to these customers that you could do here. You could move this volume and produce it at this plant on this date to get this delivery date. You could manage your manufacturing processes and your timetables for delivering all of this data on Tableau. I want to ask a question about just that point. And I don't mean to take you off track, but I just want to interject there. Because you've talked about the history of the bringing of the request for injunctive relief, the immediacy, the selling season that was so detrimental to ADM. But just in understanding the matrix, Mr. Sinley also has to keep up in pricing, transportation, corn prices, what would Cargill sell a similar product for? He is continuing to supplement his education and knowledge of the industry to use this information. But he only has a general sense of how it works, and there's many moving parts within the matrix. He knows all the – he's 28 years at ADM. He has access to the Tableau system only for his 100 clients. He has only solicited two, two ADM customers he had just served on behalf of ADM the week before. He accesses Tableau eight times on the last day of work before he drives four hours to Decatur for his retirement. There's testimony as to why potentially it trained the other employees. But I want to stop here on this one point because the idea that the – I just lost my thought, I'm sorry. The matrix – I think you're asking the matrix information because it fluctuates. He's got a state current in the market. The margins, the real critical information he knows, the information is about how much it would cost us to deliver from this plant, when we can manufacture at this plant. Those are constants. What fluctuates is he's picking up the paper and reading the price of corn at the Chicago Board of Trade. This is not a secret that's even within the realm of what we're protecting. We're protecting his knowledge, his unique access as to how with that customer, from where they get their product manufactured, delivered, their terms, the timing of it, and how he can, if he knows the price of corn is 30 cents higher, he knows how that's going to impact margin because he has all the other elements of the matrix that, in terms of margin, remain fairly constant in accordance to Mr. Lutz's testimony.  Are you suggesting during the eight hours of accessing the database, he was downloading information or making notes? He had 28 years with ADM, 18 years with ADM in this particular position, three years of access on the Tableau system that he would access as he did his job regularly and consistently. He did have that, what I would call the 11th hour, ninth inning, whatever, access to it. Yes, there may have been some innocent reasons for it, but what can we infer, or what could the trier of fact, Judge Little have also inferred from those circumstances, that you had three weeks to do this transfer of information, you hit it eight times on the last day when you really had no meaningful opportunity to share the information with the sales staff, you had already made contact with one of the ADM high margin customers while you were still employed by them, you had concealed from ADM that it was your intention to start this consulting business when you were telling them that I was retiring to become a full-time farmer, only now to claim you're a part-time consultant making more money consulting for two ADM customers than you made for ADM, and that you had entered those agreements within two weeks of leaving ADM. I think that's a body of inference and circumstances which in, be it inevitable use, that's all you have. No departing employee is going to confess, I intended to steal your secrets and compete with you. We're not going to get that, we can only make the case from a web of circumstances that I believe our trier of fact is not abusing his discretion in having determined that we have made a fair question of reasonable prospect for succeeding on the merits at a complete trial. Would you agree that this is an unusual case in the sense that he didn't go to work for a competitor? I do, and I think that difference I believe makes the ADM position stronger, not weaker, because the information he possessed has more immediate and direct impact. As the Trade Secret Act would say, the economic value to the other person is far more valuable in this instance, whereas Cargill, to use them, if they knew how ADM priced their goods, Cargill still has to look at how they price it because they're not going to, just to beat ADM, we're not going to take it in the shorts with a big loss. So when you move to another employer, there is a bit of a limiting factor as to how you can be harmed because that new employer has to actually be poised and capable of competition, no matter what secrets you take to them. When he takes it to this buyer, he's competing with us directly. I mean, we don't have any other third-party capabilities at issue. He's using it directly against us to lever down our price and the economic loss that follows from that. And they say, if we don't want to suffer that economic loss, just don't sell to that customer. Well, we have to move volume. We have factories and plants that exist to buy corn, to produce volume, and that would be economic loss. Would you be required to show at trial that you had the inability to move approximately the same volume? I don't believe so because what we have is a situation where, in many respects, a lot of these items are fungible. And the marketplace works. There has to be sufficient demand for what you're selling. And if your ability to oversupply exists, and when you've got narrow margins to the big buyers, larger margins to the smaller buyers, you are now losing out. Yeah, we might be able to push it off on a large, small-volume buyer. But these particular customers on the continuum were more price takers. They are a more profitable, more client-service-relationship-type customer as opposed to a large commercial manufacturer that is very narrow margin. And you might. There's some that measure speculation. But we would not be able to move it to the same margin customer if we lost that. Thank you. Thank you, counsel. Rebuttal? Yes, Your Honor. First point, I implore the Court and ask the Court to scour every single piece of evidence and every single testimony on the record, and there is nothing in the record, and it was a misstatement I submit, that Mr. Sinley was going to assist high-margin customers, that that's what he was going to do. There's nothing of that nature. It's just not there. He's going to assist customers to get bids from all five competitors. That's what he would be doing. So, please, reason. Is there anything in the record that, pardon me? Go ahead, Judge. Is there anything in the record to support Mr. Sinley having obtained these other bids from the four other or five other? I'm sorry, that he was? Is there anything in the record that Mr. Sinley actually facilitated the other bids from other companies? No, there was evidence he had another customer that he was going to represent that wasn't the two ADM customers, which he did know, but it's no trade secret that he knew who they were, the names of the customers. But, yes, there's evidence he had a smaller company he was going to get a bid from. The two customers that he had entered into agreements with, though, the major point I would make is that there was no evidence that Mr. Sinley was targeting those two customers or were even two high-margin customers, or that was his game plan. That's just not there, and he wasn't making any use of whatever margin information, if he could memorize it or anything. It's all speculation. The appellate just talks about, oh, it could do that, or probably, maybe he'll do something.  I mean, every employee has access to company documents or internal budgeting or whatever, could have raw material costs, could have margins, and they're not all restrained from working somewhere else later because they may have access to that information. And that's what this would do under this true speculative, probably he could do this and that, because you're turning someone who never had a restrictive covenant into having one. I mean, and that's why I say this is an important case for the court, because I've represented employers for 35 years and individuals sometimes in cases like this, and employees have access to cost information and everything, but they don't get restricted from pursuing their livelihood later unless they have a restrictive covenant agreement. Then to answer the court's question earlier, I did want to point out the actual nondisclosure agreement. That's one sentence of that two-page document attached to the verified complaint. It does say, Mr. Sinway agrees not to use or disclose to any person, firm, or corporation at any time, either during his or her employment with the company or thereafter. And then there's a sentence of what they claim is confidential information. You don't dispute the standard of review as abuse of discretion? Well, I disagree with that, but I think the standard of review that this is a legal question that relates to whether or not the court can impose a non-competition restriction against a former employee when he is not working for a competitor. I would suggest, and there's some of that in the brief, you know, what standard should be used. And you'll see a lot of cases the court reviews, they'll call it de novo of restrictive covenants because they're looking at enforceability of a restrictive covenant or here entering an injunction. So I think you have a de novo review on the issues raised, but I would really say it doesn't matter. Because no matter what standard you look at, it just hasn't been met. Counsel, what about the longevity of the trade secret and the potential for success in the merits? We were talking about a season wherein information was known on the matrix of what I call it, to a competitive advantage of Mr. Sinley. How long does this go on? Does this go on infinitum? Well, that's, yeah, it's a good question. I mean, that's part of the problem. If they want to go prove under a Trade Secrets Act misappropriation case, and you actually prove a trade secret, and you actually prove it's misappropriated, then the court would say you can't use it as long as it's a trade secret. But none of that has been shown here. There's no evidence he's used any trade secret. The court didn't even identify a specific trade secret that would inevitably be disclosed. And the last thing I'd like to leave the court with, of course, I'll answer any questions if there are any, is I think the case of Colson Covey Whittle, which was a Fourth District appellate case, is very instrumental from this court. That case includes the following language I'd like to leave the court with, and it's the second part of the answer to your honest question, before I run out of time. Regarding the difficulties that arise when a former employee isn't joined from soliciting customers of the former employer, we find persuasive the statement by Federal District Judge Milton Shader in a somewhat similar case under Illinois law. Such information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations, or analysis. Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself. It would disserve the free market goal of maximizing available resources to foster competition, or to frame the issue in the way discussed earlier in this opinion. It would not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous competition. All this does not render helpless. An employer worried about the skills and knowledge an employee acquires during the course of employment will give him or her an undue competitive advantage. Nothing prevents such an employer from guarding its interests by a restrictive covenant. But it would really be unfair competition to allow the employer without such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market. Then, to achieve the kind of protection being sought in this case, Colson should have required its prospective employees to sign restrictive covenants as part of their employment contracts. I think that's it. Thank you. Perhaps I overextended my stay, so I was done. Thank you very much, Your Honors.